## Richmond.

PIEDMONT ELECTRIC ILLUMINATING CO. v. PATTESON'S ADM'X.

APRIL 17th, 1888.

Absent, Richardson, J.

1. MASTER AND SERVANT—*Allegations—Proof—Contributory Negligence.*—Declaration alleges that by defendant's negligence the electric current passed through and killed plaintiff's intestate whilst engaged about his special duties in defendant's service. But plaintiff fails to prove that defendant in any way, by commission or omission, caused the current to pass through and kill the intestate:

HELD:

The inference is inevitable that the intestate's contributory negligence was the proximate cause of his death.

2. IDEM—*Defective Appliances—Contributory Negligence.*—Where the defects in the shunt-cord used by intestate caused his death, were visible to him, and yet he chose it for himself, without necessity or direction, he was guilty of contributory negligence, and there can be no recovery.

3. IDEM—*Case at Bar.*—In action against an electric light company for negligently killing an employee, it was proved that he was sent to look for a break in the circuit whilst the current was on, and took with him a defective shunt-cord. He found the break, and trying to turn on the current, grasped the cord at its defective end, and, at the same time, put his other hand on the naked end of the line wire, whereby the current passed through and killed him. Had he grasped the line wire above the exposed end he would not have been injured, notwithstanding the fact that the shunt-cord was defective in not being insulated throughout its entire length:

HELD:

The evidence failing to show negligence on the defendant's part unmixed with the intestate's contributory negligence. was insufficient to sustain the verdict for the plaintiff.

Error to judgment of corporation court of the city of Lynchburg, rendered December 30th, 1886, in an action of trespass on the case wherein Kate Patteson, as administratrix of Miles Patteson, deceased, was plaintiff, and the Piedmont Electric Illuminating Company was defendant. Verdict was for plaintiff for $3,000 damages. Defendant moved to set aside the verdict as being contrary to the evidence. The court overruled the motion. The defendant excepted, and the court certified all the evidence. The defendant obtained a writ of error and *supersedeas* from one of the judges of this court.

*Sheffey & Bumgardner* and *Kean & Kean*, for the plaintiff in error.

*Kirkpatrick & Blackford*, for the defendant in error.

The only question involved in this appeal is whether the court below erred in overruling the appellants motion for a new trial, on the ground that the verdict of the jury was contrary to the evidence. The facts proved on the trial are not certified by the trial court, but it has certified the evidence in full. In such cases the rule governing the appellate court is well established by a series of cases, all of which utter the same decided voice. The petition for appeal filed in this case invokes this court to depart from that well established rule; but this effort is obliged to fail, for this court has again and again refused to modify the rule in any respect. The first case in which it passed on this question was that of *McDaniel* v. *Comm.* There Judge Hinton, delivering the opinion of the court, (77 Va., 283) said: "Upon an application of this kind, this court is always loth to disturb the judgment of the trial court. On this point, Christian, J., delivering the opinion of the court in *Pryor's case*, 27 Gratt., 1010, said: 'This court has always acted with great caution in granting new trials in cases where the new trial is asked solely upon the ground that

the verdict is contrary to the evidence, and great weight is always given and justly so to the verdict of the jury and judgment of the court in which the case is tried. The cases are very rare in which this court interfered; and it is only in a case where the evidence is plainly insufficient to warrant the finding of the jury.' I fully recognize the salutary influence of this rule, and have no purpose to relax its operation."

Following that case, this court in *Priest* v *Whiteacre*, 78 Va., 151, President Lewis delivering the opinion, said: "It is well settled that where some evidence has been given tending to establish the fact in issue, or where the evidence consists of circumstances or presumptions, a new trial will not be granted merely because the court, if upon the jury, would have given a different verdict. The evidence must be plainly insufficient to warrant the verdict, to justify the court in setting it aside. And this restriction applies *a fortiori* to an appellate court; 'for in the appellate court there is superadded to the weight which must always be given to the verdict of a jury fairly rendered, that of the opinion of the judge who presided at the trial, which is always entitled to peculiar respect upon the question of a new trial.'" President Lewis, delivering the opinion of the court soon afterwards in *Russell's case*, 78 Va., 400, used the same language as above. In *Montague and Wife* v. *Allen's Ex'or*, 78 Va., 592, Judge Fauntleroy reiterates the judgment of Judge Scott in the *Grayson case*, 6 Gratt., 712, which President Lewis had twice approved as above. He also approves the language of the old court in *Blosser* v. *Harnsbarger*, 21 Gratt., and in *Krugh* v. *Shanks*, 5 Leigh, 598, and quotes Judge Baldwin in *Patteson* v. *Ford*, 2 Gratt., 24, as follows: "Much respect is due to the opinion of the jury, whose province is to weigh conflicting evidence, to scan the credit of witnesses, to estimate the force of circumstances, probabilities and presumptions, and to canvass intentions and motives. This is so evident that courts habitually defer to the conclusions of juries upon matters of fact, though opposed to their

own." And in *Proctor* v. *Spratley*, 78 Va., 254, Judge Fauntleroy states the rule in such cases very clearly. Says he: " This court by an unbroken current of decisions, has held that it will not reverse the judgment of the court below, unless after rejecting all the evidence of the exceptor and giving full faith and credit to that of the adverse party, the decision of the court shall appear to be wrong." And again: "When the case before the jury depends on the credibility of witnesses, and the court below refuses to grant a new trial, this court will not reverse its judgment."

In *Jones* v. *Rixey*, 79 Va., 656, Judge Richardson is equally clear and emphatic, quoting Burks, J., who in *Blair & Hoge* v. *Wilson*, said: "Every reasonable presumption should be made in support of a verdict fairly rendered"; and again: "In such cases the long and well-settled rule is that the appellate court will only consider the evidence introduced by the party who prevailed in the court below, and will not reverse the judgment unless, after rejecting all the parol evidence of the exceptor, and giving full effect to that of the adverse party, the decision below still appears to be wrong. This doctrine is too well established—too familiar to the profession—to need the citation of adjudged cases, which are numerous and directly to the point."

And in the latest deliverance of this court reported, we have the same declaration of the law. In *Moses* v. *O. D. I. & N. Works Co.*, 81 Va., 22, Judge Hinton again says: "Under the well-settled rule of this court, it can take no cognizance of the case, unless, after rejecting all the oral evidence of the excepting party and giving full force and credit to the evidence of the adverse party, the judgment still appears to be wrong."

We thus see that this court has persistently followed the older cases of *Bennett* v. *Hardaway*, 6 Munf., 125; *Ewing* v. *Ewing*, 2 Leigh, 337; *Green* v. *Ashby*, 6 Leigh, 135; *Rohr* v. *Davis*, 9 Leigh, 30; *Pasley* v. *English*, 5 Gratt., 141; *Vaiden's case*, 12 Gratt., 717; *Carrington* v. *Golden*, 13 Gratt., 587;

*Gimmi* v. *Cullen*, 20 Gratt., 439, and the more recently decided cases.

We deduce the following principles from the decisions above referred to:

1. In cases like this, appellate court gives great weight and credit to the verdict and judgment to be reviewed, and will interfere only when they are manifestly wrong.

2. The appellate court will not interfere merely because it would have decided differently if called on to act in the court below.

3. It will not interfere where some evidence has been adduced to sustain the verdict, nor where the evidence involves circumstances or presumptions on the weight and effect of which this court cannot pass with certainty.

4. In no case will the appellate court reverse the judgment complained of unless, after rejecting all the oral evidence adduced by the appellant, and giving full effect to that adduced by the other side, the verdict of the jury appears to be plainly wrong.

5. Every reasonable presumption should be made in favor of a verdict fairly rendered.

Applying these principles to the facts of this case, can the court say that the verdict of the jury was plainly wrong? Let us examine the facts as they appear from the evidence of the plaintiff in the court below.

And here let it be observed that on the trial of this case there was no demurrer to the declaration; no objection to any portion of the evidence; no instructions asked of the court by either side.

The case is brought under our statute as found in the Code of 1873, ch. 145, §§ 7, 8, 9 and 10, as amended in 1878, Session Acts, p. 221.

Miles Patteson, the plaintiff's intestate, was a negro man, uneducated, about thirty years of age, noted as a cautious man, who was employed by the defendant company as a " day trim-

mer " of its electric lights on the streets of Lynchburg. He had been employed only three or four weeks when he was killed on the night of March 23d, 1886. He had been employed by that company previously for two or three months, but it was under a former superintendent or manager.

The lights were operated in three separate circuits—each of which had about forty-eight or forty-nine lamps. These lamps were fixed on poles about twenty-two feet high, and had to be trimmed, cleaned and examined by the trimmers climbing these poles. Patteson was a day trimmer. There were three or four of these—at least one to each circuit. Each of the lamps had to be trimmed or fixed every day. While being thus trimmed or fixed there was no electric current on the lines. As soon as the lights were trimmed, the circuit was tested with a magneto to see that the line was closed. If the magneto rang a bell in the office, the line was known to be closed. If it failed to ring the bell, it was said to be broken, and examination had to be made to see where the break was and to remedy it. This examination could be made while the current was off, just as all the day work was done, but it required a little more time to make the examination while the current was off than when it was on. The difference, however, was not material, as there were six or seven men to make the examination of the broken circuit, every lamp of which could be examined and trimmed by one man in four or five hours.

In order to protect the men against the dangers incident to examining the circuit while the current was on, it was necessary that each should be furnished with a shunt-cord or switch, which is a piece of insulated cable, with screw-hooks on the ends, which could be fastened on to each end of the line wire at a lamp, and so the current would pass around the lamp and leave it separated from the line. In this condition the lamp could be examined with safety.

It being ascertained that one of the circuits was open, Miles

and six others were sent out of the office by the superintendent about dark on the night in question. They all got their shunt-cords or switches from this office; Miles went out with his in his hand. The superintendent was present. He ordered them to the work. The switch which Miles had was horribly defective. Indeed it was absolutely worthless. It was produced to and examined by the jury. Shortly after Miles left the office he was met by Policeman Adams with a short ladder in his hands. Soon after that the broken line was seen to light up with a flash, and in a short time afterwards it lighted up again with the same flash. Very soon afterwards Miles Patteson was discovered at the top of a lamp pole, hanging there and evidently dead. When taken down, his two hands were severely burned, and his shunt-cord or switch was found with one end entirely broken off and the insulation at each end destroyed for several inches. From these facts it is evident that his death was caused by the passage of the powerful electric current through his body while attempting to fix this lamp, and this was occasioned directly by the defective and broken shunt-cord.

[Here the counsel recited the evidence in the case for the plaintiff below, which is as recited in the opinion of the court, except that F. M. Bryant being recalled, testified that at the time of Patteson's death there were no switches like those produced by Fraley in the office, and that these were introduced afterwards. He also said, " Mr. Fraley, after Patteson's death, told us if we talked about his death to outsiders, he would discharge us from the company's service. * * * After Patteson's death, they generally left the current off when the circuit was examined for an open connection ".]

It also appeared from the defendant's testimony (if that can be considered at all) that very erroneous and very mischievous instruction was given to Patteson by Wyatt Rose, the negro under whom Patteson was placed for instruction when he entered the service of the company, and that this instruction,

as to the disadvantage of the shunt-cord, was possibly the cause of Patteson's death.

It also appeared from testimony of Richmond, another of the defendant company's witnesses, that the circuit could be tested without putting on the terribly dangerous current by which the lamps are lighted; that was done with a little instru- ment which he called a magneto, which, by turning a crank, rang a bell in the office if the circuit was closed.

This testimony clearly establishes the gross negligence of the defendant company, and that this negligence was the proximate cause of Miles Patteson's death.

The law applicable to these facts will now be briefly stated. The defendant company is a New York corporation. Its busi- ness in Lynchburg was conducted by a superintendent, who had sole and absolute control. There is, therefore, no question that this superintendent—Fraley—is the *alter ego* of the com- pany, and that for any negligence of his, the company is responsible. Nor does the law between fellow-servants come into play here. The only questions are—

1. Did the defendant's negligence cause the death of Miles Patteson?

2. Is his personal representative prevented from recovery by any contributory negligence?

Our adversaries admit that it was the duty of the company to provide their employees such appliances as are reasonably best calculated to insure their safety. They will also admit this duty is enhanced by the very dangerous character of their business, and that their care and diligence to protect their employees must be commensurate with the dangers incident to the business, and regulated also by the character of the em- ployees.

It is the obligation of the master, "whether a natural person or a corporate body, not to expose the servant, when conduct- ing the master's business, to perils or hazards against which he may be guarded by proper diligence upon the part of the

master; that the master is bound to observe all the care which prudence and the exigencies of the situation require in providing the servant with machinery and other instrumentalities adequately safe for the use of the latter, * * * and this is the more important and the degree of diligence in its performance the greater in proportion to the dangers which may be encountered." *Hough* v. *Railway Co.*, 100 U. S., 213; *Wabash Railway Co.* v. *McDaniels*, 107 U. S., 459.

But our adversaries, in their petition for appeal, meet these views with three distinct contentions. They say—

1st. The evidence fails to show that the defendant company was guilty of any negligence.

2d. That the evidence fastens contributory negligence on the plaintiff.

3d. That the plaintiff knew all the risks which he encountered in the defendant company's business, conducted as it was, and knew also the risk which he encountered in using a switch he knew to be defective, and by continuing in the defendant's service with such knowledge, he waived all right to indemnity for injuries resulting from these causes.

The first of these needs no further notice. The second only requires us to state that contributory negligence was a defence which should have been established on the trial; that the burden of proving it rested on the defendant, and that, in the opinion of the jury, it failed to do this, and this court cannot correct their error here, because there is nothing in the appellee's testimony which shows he was guilty of contributory negligence.

The third contention is more important, and it is urged in the petition with ability and on a considerable show of authority. But we will demonstrate that here, too, this court cannot interfere. The highest courts of England and of this country have declared that, whether a plaintiff's knowledge of the dangerous manner of conducting a business or of the defective character of the instrumentalities with which he does his work,

amounts to a waiver of his right to indemnity or not, is a question for the jury, and that such knowledge is only a part of the question of the plaintiff's negligence in the premises; that in all such cases this question is for the jury, whose decision will not be disturbed by an appellate court unless it was a plain deviation from the evidence before it.

This contention has been urged with great earnestness in a number of very notable cases. See *Patterson* v. *Pittsburg R. R. Co.*, 76 Penn. St., 389; *Kroy* v. *Chicago Railroad Co.*, 32 Iowa 357; *Snow* v. *Housatonic R. R. Co.*, 8 Allen, 441; *Huddleston* v. *Lowell Mach. Shop*, 106 Mass., 282; *Ford* v. *R. R. Co.*, 110 Mass., 240; *Clarke* v. *Holmes*, 7 Hurl. & Norm., 942; *Noyes* v. *Smith*, 28 Vt., 59; *Bartonshill Coal Co.* v. *Reid*, 3 McQueen, 262; *Kain* v. *Smith*, 89 N. Y., 375.

*Clarke* v. *Holmes* is the leading English case on the question involved here. The plaintiff was employed in the defendant's cotton factory. When he entered the service the defendant's machinery was fenced, but after a few months, either from decay or other cause, the guard was broken down and the machinery remained unfenced. The plaintiff complained of this and the defendant promised to have the guard restored, but this was not done and some time afterward the plaintiff, while oiling the machinery, was seriously injured. The jury on the trial found for the plaintiff. Cockburn, C. J., on appeal, said: "It was indeed strongly urged upon us, on the part of the defendant, that as the plaintiff, upon becoming aware that the machinery was no longer properly fenced, instead of refusing to go on, as he might have done, continued to perform his service with a knowledge of the increased risk to which he was exposed, he must be taken to have voluntarily incurred the danger, and is therefore in the same position as if he had originally accepted the service to be performed on unfenced machinery. I am, however, of opinion that there is a sound distinction between the case of a servant who knowingly enters into a contract to work on defective machinery

and that of one who, on a temporary defect arising, is induced by the master, after the defect has been brought to the knowledge of the latter, to continue to perform his services under the promise that the defect shall be remedied. In the other case it seems to me that the servant by no means waives the right to hold the master responsible for any injury which may arise to him from the omission of the master to fulfill his obligation. No doubt a defect thus arising in machinery may be such that no man of ordinary prudence would run the hazard of working on it. If a jury should find that the party complaining had materially contributed to the injury by his own rashness, the action could not be maintained, inasmuch as it is a well-established rule that a plaintiff who has materially contributed to his own injury by his own negligence cannot recover, although he may show negligence in the opposite party. But the question whether the injury of which the plaintiff complains is to be ascribed wholly to the negligence of the defendant, or whether the plaintiff has had any share in bringing it about is one only for the jury. In the present case the jury have determined this question in favor of the plaintiff, and we are bound by their decision. It is indeed put to us that, notwithstanding this finding of the jury, the knowledge of the plaintiff that the machinery was unfenced is, in point of law, sufficient to prevent the plaintiff from recovering; but I am of the opinion that it is only a fact in the case to be taken into consideration by the jury with all other facts and circumstances in determining the question, whether the plaintiff himself has helped to bring about the accident, in respect of which he seeks to charge the defendant. In this sense, and in this sense only, such knowledge might afford an answer to the action. It does not do so in point of law. Therefore in every case, except where the danger is obvious, the question is for the jury whether remaining in service after knowledge of the danger, is in fact such negligence on the servant's part as excuses the master's liability in that particular instance."

The above case is very like the one at bar on this particular point, but our case is stronger than that. There as here the machinery was out of repair. In that there was complaint on the part of the servant, showing his knowledge and appreciation of the danger, here we have no evidence that the plaintiff's intestate understood and appreciated the situation. Here the defendant's superintendent had observed that the switches were out of repair, and he had ordered them to be repaired, but as is stated by Bryant, " Mr. Covert, Mr. Fraley's assistant, fixed them. Mr. Covert had been fixing the shunt-cords, but I don't think they had finished fixing them. They were called off about some other work and did not finish." Patteson doubtless knew this, for all the work was carried on in the office, and it was there he reported for duty, and it was there he found the shunt-cord he used. And it was in this condition of things when the superintendent was actually engaged or had been very recently engaged in the work of repairing the shunt-cords that Patteson, on an emergency, was called on to use the imperfect shunt-cord. The jury from an inspection of the two shunt-cords, the one which had been fixed and the one which Patteson used, were convinced that Patteson used the broken one because there was no other for him. We can say, therefore, here with far more justice than Byles, J., could say in the above case, that the action of the master " exercised a species of compulsion over the servant."

The remarks of Wood in his work on Master and Servant, at section 366, are so strikingly pertinent just here that we will copy the most of that paragraph: " A master is not liable for injuries to his servant while using machinery in the employment of the master if the servant has the same knowledge of its defects or the danger incident to its use as the master, in the exercise of due care, possesses, and at or before the time the accident occurred there was nothing to indicate any danger, such as demanded or suggested precautions which were omitted. The liability of the defendant in such cases

arises from the fact that he was the cause of the injury by employing his servant in work when he knew, or ought to have known that the machinery by which he carried on the work could not be safely used for that purpose, and that its use was accompanied by extra risk and danger. But a servant may maintain an action against his employer for injuries sustained by himself resulting from the negligence of the employer in a matter in which, from the nature of the employment, the laborer had a right to rely on the care and superior knowledge of the employer. It is true the employee himself is bound to exercise all reasonable care and prudence, and if an injury results from his want of care or through his own negligence, combined with that of his employer, he has no right of action against the latter; but in determining what would be negligence on the part of the workman, reference must be had to his limited means of knowledge; to his ignorance of the structures, machinery and processes upon which he is employed, and also to the fact that men whose business is the lowest form of human labor are not given to thought, and reflection and foresight."

How exactly are these words applicable to the case in hand, where the servant was an ignorant negro, who had been born in slavery, and who was now engaged under the eye and under the control of a scientific engineer, and both engaged in a business involving the most powerful and destructive agency known to man, and one about which the most learned knows so little!

The case of *Holmes* v. *Worthington,* more recently decided in the English courts, reiterates the doctrines advanced in *Clarke* v. *Holmes.* See the case in 2 F. & F. 533. It holds that if a servant knows that machinery has become imperfect and dangerous, and continues to use it with a reasonable expectation that it will be repaired, and an accident happens through its defective condition, he is not, by his knowledge of such defects, precluded from recovery. "The question is for the jury,

whether he was, in fact, guilty of contributory negligence by remaining." Wood, § 861. See also Wharton on Neg., §§ 217, 218, 219, 220, and 221; Cooley on Torts.

Notwithstanding these strong cases, which by reason of the high standing of the judges who decided them, deserve the greatest respect, we would be uncandid did we not admit that there are cases which go the full length for which our adversaries contend. These conflicting decisions have called forth a protest from the text writers.

Now, in the case at bar, the master had actually commenced—it may be of his own accord and without any complaint from Patteson—to repair these imperfect switches, and had only stopped the work of repair, it would seem, because something occurred to interrupt it. We may, therefore, justly insist that Patteson, by using the defective shunt-cord, did not waive his right to claim indemnity for any injury which might come to him in consequence of its defects. So the jury thought and said, and this court will not usurp the power of setting aside its verdict.

And we think that in most of the cases adverse to our view, it will be seen that the tools, materials, or appliances were in the use of employees whose use enabled them to see the defects and to appreciate the risk attending their use, and generally such use is removed from the eye of the master, and certainly not under his immediate and constant supervision. But here the tool was kept in the master's office—under his eye—and that master had undertaken, as he was obliged by common every-day duty, to look after these switches and to keep them always in repair. Patteson had not served out his first month. He knew possibly that the switch was defective, but it is hardly probable, or, indeed, possible, that he understood and appreciated the risk attending its use, and if he did, it would be a grievous wrong and injustice to hold that, under all the circumstances, by using it, he waived his right to indemnity. But, finally and conclusively, this, according to every author-

ity, was a question for the jury, and its decision ought not to be disturbed. The jury have, in the language of Baldwin, J., quoted and approved by Judge Fauntleroy in 78 Va., 592, "weighed the conflicting evidence, have scanned the credit of the witnesses, estimated the force of circumstances, probabilities, and presumptions, and canvassed the intentions and motives of all parties," and, having done this, their verdict must stand.

FAUNTLEROY, J., delivered the opinion of the court.

This suit was brought for damages for the death of the plaintiff's intestate, Miles Patteson, alleged to have been caused by the negligence of the defendant company, on the 23d day of March, 1886, in the city of Lynchburg, Va., while the said Patteson was in the discharge of his duty as an employee of the said company. Upon the trial of the case there was no demurrer to the declaration, no objection to any portion of the evidence, nor instructions asked of the court by either side; and the jury, upon the evidence, rendered a verdict for the plaintiff for $3,000 damages, apportioned, under the statute, to the widow and the infant child of the deceased. Thereupon the defendant company moved the court to set aside the verdict and grant it a new trial, on the ground that the verdict was contrary to the evidence, which motion the court overruled, and entered judgment that the plaintiff recover against the defendant $3,000, with interest thereon, to be computed at the rate of six per centum per annum from the 22d day of December, 1886, till payment, and the costs, etc.

The only question presented by the record is, whether the court below erred in overruling appellant's motion for a new trial, on the ground that the verdict of the jury is contrary to the evidence. The facts proved in the trial are not certified by the trial court, but the evidence is certified in full. Such being the case, the well-established rule of this court is, that

"the evidence must be plainly insufficient to warrant the verdict, to justify the court in setting it aside." *Priest* v. *Whitacre,* 78 Va., 151.

The judgment complained of in this case will be affirmed, or reversed, according as the verdict of the jury shall be warranted, or unwarranted, by the evidence adduced by the plaintiff in the court below. The case for the plaintiff, who prevailed in the court below, rests upon the evidence of four witnesses:

First. Policeman Adams testified that he is a member of the police force of the city of Lynchburg; that on the night the plaintiff's intestate came to his death, witness saw him hanging on the pole of the electric light, at the corner of Eighth and Jefferson streets; "he was dead, and was taken down in my (witness') presence. I passed him just before he went to that pole, and a few minutes after saw him dead. The defendant company had its city office on Eighth street, near the Arlington Hotel. I knew Miles Patteson (plaintiff's intestate) when I saw him. He was a colored man, about thirty years of age. He was killed about eight o'clock in the evening of the 23d of March, 1886; think he was a sober man, and seemed to be sober then. When I first saw him on the street, shortly before he was killed, he was carrying a short ladder, about eight feet long, the hands used in climbing the poles. The pole on which he was killed is about twenty-one to twenty-two feet high. I do not know what Patteson's business was—what his duties were. The electric lights in that part of the city were not lighted at that time. The lamps light up twice—that is, there were *two flashes* between the time I first saw him on the street and the time I saw him on the pole dead. I saw his overcoat flapping, and called to him, and got no answer. I then went and saw Mr. Fraley, the superintendent of the defendant company at Lynchburg, and told him there was one of his men killed, and where. In the interval between the two flashes I walked about half a square. It was a drizzling night."

Second. R. C. Cobbs, a colored man, a witness for the plaintiff, testified: " I did not see Patteson at the time he was killed. When I got there they were getting him down. He was in the employment of the defendant company at the time. It was about ten minutes after eight o'clock in the evening, when he was got down. Patteson was a day trimmer. The work of a day trimmer was done between the morning and the evening. They begin about seven o'clock in the morning, and get through about half-past twelve, the sooner the better. I was at that time a night inspector, which is night work altogether, and consists in seeing that the lamps are doing all right, and if not, to put them right. At that time there were three or four day trimmers, I don't remember which. There are three circuits in Lynchburg, and one man to each circuit, on the day force, and the same on the night force. I had been in the employment of the company about eighteen months. Miles Patteson had been in the employment of the company under Superintendent Rockoff, who was superintendent before Mr. Fraley, for two or three months. He then quit and went away from Lynchburg on some railroad work. He then came back, and went into the employment of the company again for three or four weeks, when he was killed. The practice in Lynchburg is for the current not to be on when day trimming was being done. There is generally a test to see whether the circuit is complete. The current is not put on while the men are going around doing the day trimming; they don't use it in the day time. I do not know what time Miles reported he had trimmed his lamp that day. When I got to the office that evening, they said circuit No. 1 was open, and all hands were fixing to go out to look for the trouble. The lamp could be examined without the current being on, but when it is on it gives notice by lighting up the lamps as soon as the trouble is found, and all hands who are out searching can quit. A day trimmer has to examine each coupling when he trims a lamp to see that it is connected, and to clean the lamp and see

that it is in order. The right way to examine the couplings is to catch hold of the wires on each side of the coupling and pull. Whenever there is a trouble at night at lighting-up time, all hands go out to find it. They often leave the current on, because as soon as the break of connection is found and connected, it notifies all of us. Very probably it might be so that this examination for an an opening in the circuit could be made without the current. They (meaning the persons in charge) know the run of the machines. I do not. The connection in a circuit can be broken here (in the city) in the office; it could be done instantly. As soon as the connection is made on an open circuit, with the current on, it lights up. I could not recognize the 'shunt-cord' that Patteson had that night. There were several condemned ones about the office at that time. The one I saw that night after the accident, said to be the one he had, had about two inches missing. At one time the 'shunt-cords' had Keeright tape around them near the hooks to insulate them. Mr. Fraley objected to the Keeright tape which the hands had on their 'shunt-cords,' and had it taken off. They, the defendant, had Mr. Covert, Mr. Fraley's assistant, making good ones. It seems Patteson's switch (shunt-cord) he had that night was in a defective condition. When I got to the office that night the hands were all getting their shunt-cords. I got mine. Patteson got the one he had in the office. I can't say how he was killed. His right hand was burnt on the inside; his left hand was burnt also, but not so badly. In dry weather a man can handle the lamps very well. Now he can do it in any weather. The lamps have been improved. At that time, the iron lamp frames would sometimes give you a shock, more than is the case now. The shocks then were more frequent. In wet weather the current will have more effect on you. Sometimes the cast iron frame of the lamp gets charged, but those shocks from the lamps don't amount to much; they are not enough to make a man let go. The most shocks I have received have been in

making couplings, and were caused by carelessness on my part in letting my hand slip; and in changing carbons at night, if a man is not careful, is liable to get a shock. I had Patteson with me, when the first superintendent, Rockoff, was here, and got him so he could trim very well at night; day work he could do very well. He worked fast in the day, and was very particular at night. The opening could have been found without having the current on, by examining the couplings, and when the opening was found, turning the current on to see if there was another, and then looking for that. All hands, six or seven, were out that night looking for the break of connection. I think there was one extra man learning. Circuit 1 is from the corner of Fourth and Church streets to Washington street; from thence to White Rock Hill to the far end of Main street, and back to Jefferson street, and half of Daniel's Hill. It had forty-nine or fifty lamps on it then. We started out about half-past seven o'clock; the accident was within half an hour afterwards. For the men, who were out to examine the whole line and report at the office, would take about two hours. At the light-up time was when they found the circuit was open. Sometimes the broken connection may be in the machine at the station. The test of the circuit is made as soon as the last man reports. Sometimes after this a lamp has to be hung. I don't know whether there were enough shunt-cords in good order for all the hands. I got mine. It was lying on the table in the office. I know that Patteson had a shunt-cord in his hand coming towards the door as I went into the office. Mr. Fraley said to me as I went in, "You are late; circuit No. 1 is open." I answered, "Yes; rather late." I don't know what wages Patteson was getting; the usual wages were from ten to twelve dollars a week. Patteson, so far as I know, was all right. He seemed to have his mind always about him. I had known him two years. He was in Lynchburg most of that time. He was married. He had gone somewhere, to work on some railroad, between the times

he was with this company. I saw Mr. Fraley very particularly instructing him about putting in carbons. He did not do]night work, except to inspect his circuit when they light up. As far as I know, Miles seemed to be a careful man. I was late on that night. When I got to the office, Miles was standing out in the room coming towards the door. All hands were going out to look for the break of connection."

F. M. Bryant, a white man, a witness for the plaintiff, testified: "At the time of Patteson's death, I was in the employment of the defendant company; was a day-trimmer. I worked on circuit No. 3; his was No. 1. No. 3 is the one furthest from the river, on College Hill. Circuit No. 1 was open, and all started out to look for the break. The lamps flashed up twice. I started back then, and, knowing Patteson was a new hand at the business, went down towards the direction he had gone. The current was on when we started out. I took a shunt-cord with me. There were some four, five, or six, in the office in good order. It was the superintendent's business to see that the shunt-cords were in good order. Mr. Covert, Mr. Traley's assistant, fixed them. I don't think the one Patteson had was in good order. I think some of the insulation was off. Mr. Covert had been fixing the shunt-cords, but I don't think they had finished fixing them—they were called off about some other work, and did not finish. I have had pretty heavy shocks fixing lamps at night. There is more danger in rainy weather. It had been drizzling that evening. The only change made, was to look for the break when there was no current on. There is no necessity for the current to be on to look for a break in the circuit. Do not know what Miles' pay was; think it was nine dollars a week. I was paid ten dollars at that time. The usual pay was from nine dollars to ten dollars. Miles was a clever colored man—seemed to be careful, sober, about thirty years old, in good health, and strong. Did not know him well—only for two or three weeks, and not much with him. He had been in employ-

ment of defendant company under Superintendent Rockoff, and at that time had done day-trimming. He had been employed under Mr. Fraley about two or three weeks. The skin was burnt on the inside of both of his hands.. After he was killed the insulation was off of part of the shunt-wire he had, and skin was sticking to the naked wire. Patteson got the shunt-wire he had when killed that evening in the office. I never worked about electric-lighting anywhere but here; had been working at it about fourteen or fifteen months at the time Patteson was killed."

Mosby H. Payne, Esq., (white) testified: "I had known Miles Patteson about two years. His wife was my house servant. He was at my house two or three times a day and to his meals. Have seen him trimming the electric lamps. He was about thirty years of age, in good health and good physique, of average intelligence for a colored man, and had no special intellect, nor was he the other way. I don't think he had any education. I do not know whether he could read or write. Never asked what wages he got. He had no child at the time of his death. His wife was pregnant of a child—born since. She was greatly distressed at his death, and was very ill for some time. She fainted when she heard of it, and fainted once or twice during the night. The doctors were with her all night. I sat up with her, too. She was confined to her bed for a week or ten days. Dr. Thornhill stayed with her one or two nights. Her condition was alarming, especially during the first night. I saw Miles Patteson's body on Jefferson street, near the place on which he was killed. It was lying on the counter of a shop near by. This was about twenty minutes after eight o'clock. His hands were badly burnt—the right hand nearly to the bone. I do not know how long the illuminating by electric light had been in use in Lynchburg; I suppose some twelve or fifteen months. Patteson was in the employment of the defendant company, the last time, for about three or four

weeks. He had, before that time, been away from Lynchburg working on some railroad."

This is, with the defective shunt-cord exhibited in evidence upon the trial, the whole of the plaintiff's evidence as certified in the record. Testing the case upon the plaintiff's evidence alone, we are of opinion that the verdict is wholly unwarranted by the evidence, which, we think, fails to make out the plaintiff's case.

The gravamen of the plaintiff's case, as set forth in the declaration, is, that Patteson's death was caused by the *negligence* of the company in whose service he was engaged when he was killed, as stated in the evidence, on the 23d of March, 1886, in the city of Lynchburg, about eight o'clock P. M., upon one of the electric lamp-posts of the defendant company. How the death was brought about the evidence does not disclose; and the case alleged or averred in the declaration is not sustained by the plaintiff's own evidence—the *probata* do not sustain the *allegata* in the case. Each count in the declaration charges, that, by the wrong and negligence of the defendant company, the electric current was caused to pass through and kill the body of Patteson while was engaged in the discharge of his specially appointed duties in the service of the defendant company.

There is nothing in the plaintiff's evidence to show that the defendant company, in any way, by commission or omission, caused the electric current to strike and pass through Patteson and kill him; but, from the plaintiff's own showing, the inference of contributory negligence by Patteson, as the proximate *causa mortis*, is irresistible. The rule as laid down by this court, in the case of *Baltimore & Ohio Railroad Company* v. *Whittington*, 30 Gratt., 805, is "If the defendant relies upon contributory negligence of the plaintiff to defeat the action, he must prove it, *unless* the fact is disclosed by the evidence of the plaintiff, or may be fairly inferred from all the

circumstances." It cannot be seriously contended, that the mere fact that the current was on when Patteson was killed was *negligence*. It is sufficient to say, that this was and had been the mode of conducting the business from the start, and that Patteson, who had been in this service for many months, engaged to work in the business and to take the peculiar risks and hazards of the business to be done in that way; and this is the reason why all the hands, including Patteson, took with them the 'shunt-cords' that night when they went out to look for the break in the circuit. They all knew that the current was on; and there were good and satisfactory reasons, as shown by the plaintiff's evidence, why it should be on after lighting-up time, not only to save several hours of time in finding out where the break was, but to prevent the city from being kept in darkness during the search for and repairing of the breach. There was no change in the state of things, caused by the defendant's action or non-action, from the time that Patteson, with the others, went out to look for the break in the circuit, to the moment and occurrence of his death. He carried with him his shunt-cord; and, although it was defective, he knew its defects, and he selected it, and used it without complaint.

The plaintiff's evidence shows that there were three, four, five or six shunt-cords in the office in good order; and Cobbs, a colored witness for plaintiff, testifies that when he arrived in the office, late, Patteson was coming out with the shunt-cord, which he had selected; and that he (Cobbs) got from those left there by Patteson, his shunt-cord, which was in good order. If, in fact, the defects in the shunt-cord used by Patteson, caused his death, the evidence shows that they were open, patent, and visible to Patteson, who chose it for himself, and used it, unhesitatingly and without complaint, of his own selection, with deliberation and without necessity, requirement, or direction so to do. The servant is bound to see for himself such risks and hazards as are patent to his observation; and

the employer does not stand in the relation of an *insurer* to the servant against injury caused even by such defects as are known or palpable to the servant in the due exercise of his own skill and judgment. Sherman & Redfield on Negligence, secs. 92 and 93; Wood on Master and Servant, sec. 326, pp. 679 to 681, and sec. 414, p. 791, and note 1. The evidence shows that Patteson had been for many months, with a brief interval, in the service of the company in the same capacity he was in when killed; that he had been carefully instructed in the care and attention necessary to his own safety in the discharge of his dangerous duty, and that he did know how to use the shunt-cord with perfect safety to himself, and had twice turned on the current, with the shunt-cord, but a few moments before he received the shock which killed him. At the first flash Patteson knew that in his lamp the break in the circuit was, and that in his efforts to make the connection, with his shunt-cord, great care and prudence were necessary; and there was no hurry, urgency, necessity or reason for his putting himself in the line of the current in the only way possible, by holding the shunt-cord with one hand by its metal ends, and, at the same time, carelessly and inadvertently, putting his other hand on the exposed end of the line wire, and, thereby, made his body a part of the circuit, through which the current passed and killed him. It is not charged—nor can it be implicated—that there was any defect in the line wire, in its structure, or insulation; a small part of the end of the line wire being necessarily left naked in order that the set-screw might be fastened to it in the connection with the shunt-cord to restore the circuit; and even though Patteson was foolish and careless enough to catch hold of the shunt-cord at its defective end, below its insulated part—at most not three inches of it—he would have been perfectly safe, and could not have been harmed by the current; had he caught hold, with the other hand, of the line wire two or three inches from its exposed metal end, where it was carefully and perfectly insulated and

guarded. It is certain, from the very nature and necessity of the case, that but for the careless and negligent act of Patteson in grasping the naked end of the line wire—whatever may have been the condition of the shunt-cord—he could not have been killed or hurt by the current. In the case of the *City of Richmond* v. *Courtney*, 32 Gratt., 792, it is held that "where *negligence* is the issue, it must be a case of unmixed negligence to justify a recovery." Citing Dillon on Corporations, sec. 789, and cases there cited. And in the case of the *Norfolk & W. R. R. Co.* v. *Ferguson*, 79 Va., citing *Dunn* v. *Seaboard R. R. Co.*, 78 Va., it is said: "It must be proved that the injury was caused by the negligence of the defendant, or his agent; and it must *not* appear, from the evidence, that the plaintiff's want of ordinary care and prudence directly contributed to the injury."

We are of opinion, that the plaintiff's own testimony fails to prove negligence on the part of the defendant company, unmixed by the concurring and co-operating negligence of the decedent, but for which the accident could not have occurred, and that, therefore, the verdict is wrong, and the judgment founded on it is erroneous; and that the verdict must be set aside and the judgment reversed and annulled.

Judgment reversed.