Wray v. E. L. & W. P. Co.

BERTHA L. WRAY, Respondent, v. SOUTHWESTERN
ELECTRIC LIGHT & WATER POWER COMPANY,
Appellant.

Kansas City Court of Appeals, January 11, 1897.

1. **Master and Servant:** ASSUMPTION OF RISK : APPLIANCES.   The
master must furnish safe appliances or be liable for consequent injury
in the absence of negligence by the servant, but the servant assumes
all risk ordinarily incident to the work.

2. ———: OBVIOUS DEFECTS : ASSUMPTION OF RISK : NEGLIGENCE.
Where the defects of appliances are obvious to the sense of any man,
whether master or servant, the servant assumes the risk; but in the
absence of such obvious risk and of negligence of the servant, law
and common sense make the master responsible for consequent
injury.

3. ———: ———: NEGLIGENCE : ELECTRIC MACHINERY. Where a defect
in an electric lamp was such as to keep it in the current, instead of
removing it from the current, and had existed for eighteen days and
was obvious to the most casual observer, the wife of a trimmer, who
daily lowered the lamp, trimmed it and investigated its condition in
open daylight, can not recover for the death of her husband resulting
from such defect, especially where such trimmer is an experienced
man and fully understood the mechanism with the attendant dan-
gers.

4. **Evidence:** WEIGHT OF : CONTRADICTION OF PHYSICAL FACTS.   When
the testimony of witnesses is confronted by admitted facts and cir-
cumstances, which are totally repugnant to and entirely inconsistent
with it, then such testimony must give way and be counted for noth-
ing.

5. **Master and Servant:** CONTRIBUTORY NEGLIGENCE : REASONABLE
EXPLANATION OF DEATH.   Where the only reasonable solution of a
servant's death is one which makes him negligent in the execution
of his duty to the master, his wife can not recover.

*Appeal from the Jasper Circuit Court.*—HON. E. C.
CROW, Judge.

REVERSED.

*Trimble & Braley* and *McAntire & Craycroft* and *John A. Eaton* and *W. R. Thurmond* for appellant.

(1)   There was no evidence to warrant the submission of the case to the jury, and the court should have given the peremptory instructions asked by the defendant to find for the defendant. *Electric Illuminating Co. v. Patterson's Adm'x*, 84 Va. 747. The deceased must have known that the switch was useless because he trimmed the lamp every day for eighteen days with the wires in this condition, and he therefore assumed the risks arising from the switch being cut out. *Moore v. Wire Mill Co.*, 55 Mo. App. 491. (2) The defect, if any, was as clear and obvious to the deceased as to the defendant and no negligence can be predicated thereon. *Berning v. Medart*, 56 Mo. App. 443; *Fugler v. Bothe*, 117 Mo. 475; *Aldridge Adm'r v. Furnace Co.*, 78 Mo. 559; *Watson v. Coal Co.*, 52 Mo. App. 366. (3) The physical facts show that the theory of defense was correct; i. e., the cause of the accident was the coming in contact with the ground. This the court ignored. (4) Plaintiff's evidence did not even afford a bare conjecture that a defective switch was the proximate cause of the accident. No legitimate inference could be drawn from the fact that because the switch had been first burned out and then taken entirely out by the changing of the wires, that either of these acts caused the death of plaintiff's husband. The evidence must be of a character to remove the question from the domain of mere conjecture. *Breen v. Cooperage Co.*, 50 Mo. App. 202; *Glick v. R. R.*, 57 Mo. App. 97; *Hyde v. R. R.*, 110 Mo. 272; *Peck v. R. R.*, 31 Mo. App. 123; *Hite v. R. R.*, 130 Mo. 132. (5) Where the evidence is such that it would be the plain duty of the trial judge to set aside the verdict as unsupported by the evidence, it is his duty to direct a

verdict for the defendant. *Jackson v. Harden*, 83 Mo. 175; *Powell v. R. R.*, 76 Mo. 80; *Landis v. Hamilton*, 77 Mo. 554.

*Cunningham & Dolan* for respondent.

(1)   One of the points insisted on by the defendant is, that there is no evidence to warrant the submission of this case to the jury, and the court should have given the peremptory instruction asked by defendant to find for defendant.   In the first, it is asserted that there was no evidence that deceased attempted to use the switch.   This is erroneous, as the evidence of W. E. Densmore (a part of plaintiff's evidence in chief), in answer to a question put by counsel for appellant, was that the switch was found by him turned "off," when he examined the lamp the next day.   Besides this, all the evidence showed that it was the custom of Wray and other trimmers, to always turn off all the switches before attempting to handle the lamp.   This evidence was sufficient that Wray had used the switch by turning it "off."   The court could at least draw that inference in favor of plaintiff.   Not to so infer, would be to draw the inference that deceased was guilty of gross negligence, directly contributing to his death.   This the court should not do.   "In cases of death, courts are more liberal in allowing questions of negligence of defendant and contributory negligence of deceased to go to the jury."   *Kelley v. R. R.*, 70 Mo. 604; *Buesching v. Gaslight Co.*, 73 Mo. 219; *Loeder v. R. R.*, 100 Mo. 673.   The law presumes that the defendant was in the exercise of due care, and this presumption is not rebutted by the fact of injury.   *Flynn v. R. R.*, 78 Mo. 212; *Buesching v. Gaslight Co.*, 73 Mo. 229. (2)   Appellant asserts that Wray could have seen the defect in the switch, or the change made in the wires,

by the exercise of ordinary care. This is contrary to the evidence for plaintiff. These witnesses, who testified in behalf of plaintiff in chief, said in effect, that it could not have been seen by Wray in the performance of his duty. The testimony of all the witnesses for the plaintiff is to the effect, that the bottom of the hood which covered these wires, and the switch and hanging board in the lamp, came down below Wray's shoulders, when standing on his stool to trim the lamp. Thus the physical facts corroborate the above testimony. (3) The appellant draws the inference that Wray must have come in contact with the ground. This inference is contrary to the evidence of all the witnesses, especially the two boys, Bruff and White, for the defendant, who testified, that Wray was standing on his stool when shocked. The testimony for plaintiff is to the effect, that there was no mud on that part of the ground where the stool rested. Besides, the evidence all shows that there is no such thing as a perfect insulator from the earth, especially so when the earth is wet. The earth was wet that night. And, also, that a small board, with porcelain knobs, making a stool, is the best practical insulator that can be used by a trimmer. This Wray used, but it was conceded not to be perfect, and that there is no absolutely perfect insulator, and that the only absolute safety is obtained by cutting out the lamp. The slightest trickle of moisture along one of these porcelain knobs from the wooden portion of the stool to the earth, if the wooden portion was damp, might be sufficient to carry the current of electricity, and this could not be prevented except by taking the most extraordinary precautions, and even then, an accident might happen, unless the current was cut out of the lamp, hence the duty of appellant became more imperative, as the danger from failure to do it was so great. *Muirherd v. R. R.,* 19

Mo. App. 634; *Porter v. R. R.*, 71 Mo. 72; *Hamilton v. Mining Co.*, 108 Mo. 364; *Gutridge v. R. R.*, 105 Mo. 520; *Seila v. R. R.*, 82 Mo. 430.

GILL, J.—Plaintiff sued the defendant for damages resulting to her from the death of her husband, Charles E. Wray, who was killed at about 7:30 o'clock, on the night of September 7, 1895, by an electric current passing through his body, while manipulating one of defendant's street lamps, in the city of Joplin.

On a trial in the circuit court, plaintiff had a verdict and judgment for $2,000 and defendant appealed.

I.    The principal point we have to determine here is whether or not the lower court erred in refusing to take the case from the jury and peremptorily order a verdict for defendant. The material facts are these: The defendant operated an electric light plant at Joplin, lighting its streets by the ordinary suspended lamp. Chas. E. Wray was at the time above mentioned and had been for several years prior thereto, working for the defendant in the capacity of what the witnesses called a trimmer. It was his duty to visit each lamp of his circuit daily, place therein fresh carbon, and see that it was in proper condition and repair for the coming night's service. If there were any defects, such as he could not repair, it was his duty to report the same to the lineman. In addition to this daylight service, this trimmer was also required to make the rounds of his lamps after dark and after the electric current had been turned on, to see if all were in order, and if not, then to correct the trouble. He was killed on the evening of September 7, 1895, while attempting to adjust or repair one of these street lamps. The only witnesses to the accident were two

*[margin note: MASTER and servant: assumption of risk: appliances.]*

small boys, but they were unable to give any very satisfactory account of it.

The lamps were what is known as the Thompson & Huston patent. The identical lamp accompanies the record and was before us in the very learned and exhaustive oral arguments, with which we were favored by counsel of both sides. The whole process attending the distribution of electricity, as well as the machinery of this and other electric lamps, was gone over in the trial and the evidence is now here before us in the record. It would be useless to give this in detail. The Thompson–Huston lamp differed from most other patterns — has, when completed, two cut-offs, or switches, one immediately on the top of the machinery part of the lamp, which is a mere "short circuit" switch, so called because it simply carries the current of electricity from the positive over to the negative wire, without entirely disconnecting the lamp machinery, and the other is a switch or cut-off in a headboard placed in the iron hood above the lamp machinery. The purpose of this latter switch is to entirely cut off the electrical current from the lamp machinery below, so that the lamp may be disconnected and removed without destroying the circuit and interfering with other lamps. This headboard, to which is attached the latter named switch, is only a few inches above the "short circuit" switch, and both are covered by the suspended iron hood, which is a truncated cone about two feet in diameter at its base and eighteen inches high. The course of the electrical current is into the lamp on one wire, and when the circuit is complete, it passes down through the switch in the headboard, thence on through the lower switch into the lamp, down the sticks of carbon from the ends of which at the bottom of the lamp it jumps to the

other pieces of. carbon, where the light is produced, and thence the current makes its way back over the negative wire, to the dynamo.

When the trimmer, or lamp repairer, has to do with the electrical appliance, it is considered necessary for self-preservation to insulate himself from the earth, or otherwise, if he should be brought into contact with the earth and an electrical current, at the same time, the latter would pass through his body to the earth and produce a severe shock, and perhaps death, according to its intensity. This danger arises from the fact that the tendency of electricity is toward the. earth and it will always go there by the shortest and easiest route, or by the path of the least resistance. There is less resistance in the human body than in the electrical wire, and hence the current will take the former rather than the latter course, if the opportunity is offered; but if the body is kept insulated from the ground, then the current will not go that route. This insulation is effected by the trimmer's use of a step-ladder or board, on which he places himself, when working with the lamp. Wray had for that purpose a small wooden stool, with porcelain knobs for legs which he placed on the ground beneath the lamp and on which he was supposed to stand, when brought into contact with the lamp. This is considered a very effective and safe means of insulation.

Eighteen days before this accident occurred the upper switch or cut-off in the headboard got out of repair by reason of the burning out the point of contact where the positive wire attaches to the switch apparatus. The lineman (one Dinsmore, Wray's half brother) discovered it; and he says that with the knowledge of the defendant's superintendent, he repaired the lamp. In so doing he carried the wires down and attached them to the ears of the lamp proper,

thereby cutting out the upper switch and leaving the lamp with only the lower, or "short circuit" switch. The lamp remained in this condition until Wray was killed. The failure of the defendant to reinstate this upper cut-off, or switch, is charged as negligence on its part, and which it is alleged caused Wray's death The basis of the claim is that Wray had no knowledge of the change in the lamp; that he went that evening to repair the lamp, trusting and relying on the upper switch and believing it to be intact; that he threw the switch and thinking the lamp was cut out, proceeded to investigate, when the electrical current struck and killed him.

When Wray's body was taken up and examined, immediately after the accident, two, and only two, marks were found thereon—one on the ball of the right thumb, and another on the bottom of the heel of the left foot, indicating that the electrical current had entered at the right thumb and passed diagonally through the body, and into the ground at his left heel. A sheet-iron shield, that was used to protect the magnets and lamp machinery, was found pulled down and particles of paper or pasteboard there discovered, which indicated that he had been at work at the inside of the lamp machinery.

II. After a careful consideration of all the evidence in this case, as well that given orally by the witnesses as the "physical facts" attend-

——: obvious de- ing the unfortunate accident, we feel
fects: assumption
of risks: negli- constrained to hold that the plaintiff
gence.
ought not to recover. It is, of course, well settled law that the master must furnish the servant with reasonably safe appliances for the performance of his work. And if the master negligently fails to do this, or fails to repair a defective apparatus, after reasonable time, then he will be responsible for

the resulting damages thereby occasioned to the servant, *provided*, of course, the servant has himself exercised ordinary care for his own protection. While this duty is imposed on the master, it must not be forgotten that the servant is bound to look out for his own safety. If he engages in a hazardous employment, or attempts a service necessarily attended with danger, he will be held to assume all risks ordinarily incident to the work. In other words, the employer is not an *insurer* of the safety of his employee. More than this, even where there are any defects in the machinery or appliances given into the hands of the servant, still if the peril attending their use "is such as to be perfectly obvious to the sense of any man whether servant or master, then the servant assumes the risk. But if it is a case where no such obvious risks are incurred, and where it is fair to presume that the employee had been guilty of no negligence, the rule of law as well as common sense and justice is that the master is responsible for damages, if any ensue. This is the rule announced by Judge NAPTON in *Keegan v. Kavanaugh*, 62 Mo. 230, and often since that repeated. See, also, *Watson v. Coal Co.*, 52 Mo. App. 266; *Haliburton v. R. R.*, 58 Mo. App. 27; *Warner v. R. R.*, 62 Mo. App. 184; *Berning v. Medart*, 56 Mo. App. 443; *Fugler v. Bothe*, 117 Mo. 475; *Piedmont Elec. Co. v. Patterson, Adm'r*, 84 Va. 747; *Junior v. Elec. Light Co.*, 127 Mo. 79. In the last case it is said: "That if a servant capable of contracting for himself, and with full knowledge of the risk he may run, voluntarily undertakes a hazardous employment, or to place himself in a hazardous position, or to work with defective tools or appliances, the master is not liable for injuries received from these known risks."

Applying these principles to what must be taken as the undisputed facts of this case there is nothing

—: —: negli-
gence: electric
machinery.

to sustain the judgment. Conceding even that the defendant's superintendent negligently failed to repair or restore the cut-off in the headboard after being advised of its absence, it is yet clear and beyond a "shadow of doubt" that Wray, the trimmer, knew of its condition and with such knowledge continued the work without objection or complaint. Or if he did not observe the cutting out of the upper switch, it was because of his own carelessness and inattention to the work intrusted to him. This cut-off was taken out of the electrical circuit and the wires brought down into the lamp, eighteen days before Wray was killed. The change was obvious to the most casual observer—much more so was it apparent to the man in charge of the lamp and who daily went to it, lowered it, trimmed it, and investigated its condition. This was all done, too, in open daylight, when to see the condition of the lamp, Wray had only to use his sense of sight. We cast aside the statement of Dinsmore (Wray's half brother) to the effect that Wray probably did not observe the change in the lamp. When the testimony of a witness

EVIDENCE:
weight of:
contradiction
of physical facts.

is confronted by admitted facts and circumstances, which are totally repugnant to and entirely inconsistent therewith, then such pretended testimony must give way and be counted for nothing. As well said by Judge SHERWOOD: "This matter of denying probative force even to direct and affirmative testimony, when such testimony is plainly at war with the physical facts and surroundings, has passed into precedent." *Baker v. R'y*, 122 Mo. 589. Neither do we see in the iron hood, or its situation, any substantial obstruction to a view of the lamp, and all its appointments. When Wray lowered the lamp, so as to manipulate the lower

switch, and adjust and trim the carbon, it is clear that he must have seen the condition of the headboard and switch; for they were immediately before and only a few inches from his eyes. He was an experienced man and fully understood the mechanism, as well as the dangers attached to the appliance. If then he went to this lamp on the evening in question and relied on the discarded and rejected switch, it must have been by reason of his own thoughtlessness and negligence; and if this is true, then clearly there can be no recovery, since the basis of recovery would be the combined negligence of the employer and employee.

Again, in order to justify a verdict in plaintiff's favor, the burden was on her to prove that the death of her husband was *caused* by the absence of the switch in the headboard. A careful scrutiny of the record discloses no substantial evidence to prove this important fact. Plaintiff's theory is that when Wray lowered the lamp, he first took hold of the lever to the upper switch and threw it off, as he thought, so as to disconnect the lamp machinery beneath; but that, as it was out of order and useless, he failed to accomplish a cutoff and that he went to work on the belief that a complete disconnection had been effected. There is nothing in Wray's conduct, at the time, that lends support to this contention. The two small boys (who were at the time within a few feet of the trimmer) testified that Wray placed his insulating stool on the ground beneath the lamp, and having set his feet thereon, proceeded to remove the shield inclosing the magnets and at the same time cautioned the boys to be careful and not touch the wires, as "there would be a flash and they would be killed." From this evidence, it would seem that Wray knew that the lamp was not taken out of the circuit and as the boys *stood on the ground*, he wisely cautioned them not to touch the lamp, for

"there would be a flash and they would be killed." The only circumstance or scintilla of evidence upon which plaintiff can base a claim that Wray attempted to "cut out" the lamp by means of the upper switch, is found in the testimony of Dinsmore to the effect that on the afternoon of the next day, after the accident, he saw the lamp and discovered the switch to be turned "off." It appears, however, that in the morning of the same day, the witness Marion examined the lamp (and he was the first following the accident to investigate it) and he found the switch turned "on." But this may have been the one way or the other, and yet disclose nothing against the theory that Wray did not attempt to use the upper switch; for, as already stated, it had then been out of use and disconnected for more than two weeks; the switch handle was broken off and the whole apparatus had been cast aside for a period of eighteen days.

The useless and discarded upper switch can not be classed as one of those defective appliances which, though out of order, the servant might think could, without immediate danger, be used with ordinary care. It was an instrumentality that could not be used at all and to rely on it for any purpose was a gross act of negligence on the part of the trimmer. The use of and reliance on said switch necessarily "threatened immediate injury," and hence that line of cases of which *Huhn v. R'y*, 92 Mo. 440, is prominent, can not be successfully invoked to save plaintiff's case.

It seems to me that there can be but one reasonable solution of the cause of Mr. Wray's death. He did not use or attempt to use the switch in the headboard. He threw the lower or "short circuit" switch, but, as already explained, this left the lamp machinery charged with electricity. The current

MASTER and servant: contributory negligence: reasonable explanation of death.

passed over onto the negative wire, and Wray could have safely examined the lamp and repaired it if he had only observed the usual and *very necessary* precaution of keeping his body insulated from the ground. He attempted this by placing his two feet on the little board (which was only about eight by twelve inches) but during the progress of his work at the lamp, he carelessly permitted his left heel to come in contact with the ground and the electrical current, prompt to avail itself of this outlet, left the lamp and wire and passed at once through his body, producing instant death. This was the explanation given by Dinsmore in the investigation before the coroner's jury, wherein he said: "Lineman always carries his stool to stand on, so as to keep off the ground; in this case Charlie Wray had his stool but he had set it down in a muddy place and it sunk so as to come in contact with the current and his heel touched the ground, or mud, and connected the circuit that killed him. If his stool had been properly adjusted, it would not have killed him." This is the only reasonable explanation. Any other theory is based on mere suspicion, or conjecture, unsupported by a single fact or circumstance.

The verdict in this case was the result, doubtless, of the undue exercise of a sympathy, which, though proper in its place, can not be allowed to interfere in the administration of the law, and to take money from one and give it to another in the face of well settled principles.

The judgment must be reversed. All concur.